******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* FERNANDO V.*

## (SC 19885)

Robinson, C. J., and Palmer, D'Auria, Kahn and Ecker, Js.**

*Syllabus*

Convicted of the crimes of sexual assault in the second degree and risk of injury to a child in connection with his alleged sexual abuse of his stepdaughter, B, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court had abused its discretion by precluding him from presenting the testimony of B's longtime boyfriend, P. The defendant sought to introduce P's testimony to demonstrate that B had not exhibited certain behavioral characteristics that were consistent with those commonly exhibited by victims of sexual assault, which a psychologist called as an expert witness testified about during the state's case-in-chief. The defendant also sought to introduce P's testimony to contradict testimony by B's mother about certain behavioral changes that she had observed in B in the year prior to the defendant's arrest. The Appellate Court concluded that the trial court had abused its discretion in precluding P's testimony, as that testimony was relevant to whether B had exhibited behavioral characteristics typical of sexual assault victims, which bore directly on the central issue of whether she had been sexually assaulted by the defendant. The Appellate Court also determined that the trial court's error was not harmless because P's testimony could have helped to show that B failed to exhibit behavior often attributed to sexual assault victims and, therefore, could have impacted the jury's verdict. Accordingly, the Appellate Court reversed the trial court's judgment and remanded the case for a new trial, and the state, on the granting of certification, appealed to this court. *Held*:

1. This court declined to review the state's claim, raised for the first time on appeal to this court, that P's testimony about B's behavior properly was excluded on the ground that it was cumulative of other evidence admitted at trial, as it was unpreserved, and, because the state abandoned all other claims relating to the admissibility of P's testimony and there were no exceptional circumstances warranting review of the state's unpreserved claim, this court upheld the Appellate Court's determination that the exclusion of P's testimony was improper: the state did not claim in the trial court that P's testimony should be excluded because it was cumulative or raise cumulativeness as an alternative ground for affirmance in the Appellate Court; moreover, because the issue of whether evidence is inadmissible on the ground that it is cumulative is a discretionary determination to be made by the trial court, and because the state never requested that the trial court rule on that issue, this court could not determine whether the trial court abused an exercise of discretion that it neither made nor was asked to make.

2. The Appellate Court correctly determined that the improper exclusion of P's testimony was not harmless, as P's testimony was necessary for the jury to assess B's credibility and could have had a substantial impact on the verdict: the state's case against the defendant was not strong in light of the absence of corroborating physical evidence and any witnesses to the alleged sexual assaults, and, because B's testimony was the only evidence of the defendant's guilt, the case largely turned on whether the jury believed B, and the exclusion of P's testimony deprived the defense of evidence that it could have used to cast doubt on B's credibility; moreover, P's testimony was not cumulative of other testimony adduced at trial because it would have presented the jury with new material not heard from any other witness regarding the indicia of sexual abuse identified by the state's expert witness and would have conflicted directly with the testimony of B's mother that B had become more withdrawn in the year prior to the defendant's arrest; furthermore, contrary to the state's claims, the defendant's opportunity to cross-examine B and her mother did not render the error harmless, as the defendant was not constrained to present his defense solely through witnesses selected by the state, and the behavioral template to which

the state's expert witness referred during his testimony was not available to the defendant during his cross-examination of B and her mother because the expert witness testified after B and her mother testified.

(*Two justices dissenting in one opinion*)

Argued September 14, 2018—officially released March 26, 2019

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the second degree and risk of injury to a child, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Holden, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Keller, Prescott* and *Mullins, Js.*, which reversed the trial court's judgment, and the state, on the granting of certification, appealed to this court. *Affirmed.*

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Nadia C. Prinz*, former assistant state's attorney, for the appellant (state).

*Mary A. Beattie*, assigned counsel, for the appellee (defendant).

*Opinion*

ECKER, J. This is a certified criminal appeal from an Appellate Court decision reversing a judgment of conviction arising out of allegations by the complainant, B, that her stepfather, the defendant Fernando V., sexually assaulted her repeatedly over a period of years while she was in middle school and high school. The Appellate Court reversed the judgment of conviction on the ground that the trial court improperly precluded the defendant from calling the complainant's longtime boyfriend, P, as a witness regarding his observations of certain aspects of B's behavior that the state's expert witness had testified were common symptoms of child sexual assault. See *State* v. *Fernando V.*, 170 Conn. App. 44, 68–69, 153 A.3d 701 (2016). The Appellate Court concluded that the improper exclusion of P's testimony was not harmless because the evidence may have helped "to show that B failed to exhibit behaviors often attributed to sexual assault victims," which could have "dissuaded the jury from believing B's story generally . . . ." Id., 68. We affirm the judgment of the Appellate Court.

I

The following facts are relevant to this appeal. B moved to Stamford from Mexico when she was nine years old to live with her mother, brother, and the defendant, her stepfather. The defendant adopted B in 2004, when she was ten years old, and he later petitioned for her to obtain permanent residency in the United States. When B initially came to Stamford, the family lived with B's grandmother and uncle, but eventually her grandmother moved back to Mexico. B testified that she was often alone with the defendant after her grandmother's departure, and he began to act inappropriately by touching her breasts. B told her mother about the defendant's inappropriate behavior. B's mother confronted the defendant, but he denied any wrongdoing and said B was confused.

In 2006, when B was nearing her thirteenth birthday, the family moved to Norwalk. B testified that the defendant continued to touch her inappropriately after the move. According to B, she told her mother about the continuing sexual misconduct, but the defendant again denied the allegations when confronted. B testified that the abuse escalated when the defendant forced her to have sexual intercourse with him in the hallway bathroom one afternoon. She testified that the defendant thereafter continued to touch her inappropriately or to force her to have sexual intercourse on a regular basis, sometimes as often as once per week. B said that the abuse continued until approximately 2011, when she was sixteen or seventeen years old.

B explained at trial that she did not disclose immediately to her mother that the defendant was forcing her

to have sex with him because she was scared of what her mother would think. She eventually disclosed the abuse to her mother in 2011, however, when her mother directly asked B whether the defendant had forced her to have sex. B and her mother then called the police, which resulted in the present criminal case.

The defendant was charged with one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of sexual assault in the second degree in violation of § 53a-71 (a) (4), and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] The evidence against the defendant consisted primarily of the testimony of B and her mother, who testified as a constancy of accusation witness and also offered evidence of B's behavior during the relevant time period. Both B and her mother testified that B achieved good grades, participated in extracurricular activities, maintained employment without excessive absences, and continued to enjoy reading books and pursuing musical interests. B's mother also testified that she did not notice any personality changes in B when she was twelve or thirteen years old, but she did observe that B's disposition changed in the year before the defendant's arrest. "[S]he was more withdrawn, and I saw that she would stay in her room," "locked up," explained B's mother.

Toward the end of its case-in-chief, after B and her mother had testified, the state called an expert witness, Larry M. Rosenberg, a licensed psychologist and the clinical director of the Child Guidance Center of Southern Connecticut. Rosenberg testified about "delayed disclosure," which describes a commonly observed phenomenon in sexual abuse cases that occurs when a victim does not inform anyone of the sexual abuse for a period of time, sometimes lengthy, despite the suffering and trauma experienced as a result of being abused.

The origin of the present appeal can be traced to the point in Rosenberg's testimony when he was asked by the state to opine about behavioral issues other than delayed disclosure. More specifically, Rosenberg was asked by the state about symptoms exhibited by victims of child sexual assault who have made a disclosure. Rosenberg answered that there were a variety of symptoms commonly observed in such victims, including changes in behavior, disassociation, withdrawal, depression, heightened anxiety, bad dreams, flashbacks, sleep interruption, and changes in cognitive functioning. Rosenberg elaborated the point on cross-examination, explaining that depression can manifest itself in changes in mood, irritability, and angry outbursts. He stated, "[t]he list goes on, you know, bad dreams, all sorts of things."[2] Rosenberg's expert testimony apparently was offered by the state to help the jury understand the significance of the prior testimony of B and her mother, in

a manner consistent with the state's objective at trial, which was to establish the defendant's guilt. The expert testimony about delayed disclosure would help to explain why B did not immediately report the most severe abuse to her mother; the testimony about common symptoms of trauma would assist the jury in understanding why B had become more withdrawn prior to the defendant's arrest.

After the conclusion of the state's case-in-chief, the defense attempted to discredit the state's version of events by presenting the testimony of P, B's longtime boyfriend. Upon hearing that B and P were in a relationship, the trial court excused the jury to hear the state's objection that P's testimony was not relevant to the issue at hand. With the jury out of the courtroom, the defense made the following offer of proof relating to the admissibility of P's testimony about B's behavior:

"[Defense Counsel]: When you say you're in a relationship, are you—do you consider yourself boyfriend and girlfriend?

"[P]: Yes.

"[Defense Counsel]: And have you continuously gone out with her, or been in a relationship with her, as boyfriend and girlfriend, for four years?

"[P]: Yes, I have.

"[Defense Counsel]: Have there been any breaks in the relationship?

"[P]: No, there have not.

"[Defense Counsel]: Now, in the time period that you've been going out, as boyfriend and girlfriend, with [B], have you noticed any significant behavioral issues with her?

"[P]: No, not really.

"[Defense Counsel]: Have you noticed any pronounced eating disorders?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any suicidal thoughts?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any severe depression?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any eating disorders?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any anger or outbursts or violence, by her?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any trouble with her focusing on issues or tasks at hand?

"[P]: No, I have not.

"[Defense Counsel]: And, to your knowledge, do you know if her grades have slipped, in any way, in the four years you've known her?

"[P]: No, I don't think so.

"[Defense Counsel]: And, in the four years that you've known her, have you noticed any type of interruption in her playing of the flute?

"[P]: No, I have not.

"[Defense Counsel]: And, since September, 2011, have you noticed any of the things that I just mentioned, occurring with [B]?

"[P]: No, I have not."

The defense argued that P's testimony regarding B's behavior was admissible because it was relevant in two ways: first, to impeach the credibility of B's mother, who had testified that B had become more withdrawn, and, second, as direct evidence regarding the occurrence or nonoccurrence of the behavioral changes that the state's expert witness had testified are commonly exhibited by child victims of sexual assault. The latter ground in particular was twice referenced by defense counsel in colloquy with the trial court. The state, for its part, argued categorically that the testimony was not relevant and pointed out that P was not qualified to offer testimony on the subject because he was not an expert witness. The state also argued that the evidence did not directly impeach the testimony of B or her mother. In addition, the state noted its concern that it could be prejudicial for the jury to hear testimony about B's romantic relationship with P.

The trial court ruled that P's testimony was inadmissible in its entirety. The court stated that "[t]he relevance of this testimony . . . is collateral, at best." With respect to impeachment, it found that "[i]mpeachment is not, by this evidence, extrinsic evidence. It lends itself to—it's likely to confuse the jurors. It's not probative of any issues. . . . I don't see any impeachment, based upon what I've heard on this record . . . . [An] [o]ffer of proof has been made. It's on the record, should the matter be reviewed. It's there for the Appellate Court to look at. But before the jury, it's confusing. It's not probative, and . . . the objection is sustained." Therefore, P's testimony was not presented to the jury.

The jury returned a verdict of guilty on two counts of sexual assault in the second degree and two counts of risk of injury to a child. The trial court sentenced the defendant to an effective term of ten years of incarceration and ten years of special parole. The defendant appealed from the judgment of conviction on the ground

that the trial court improperly excluded P's testimony from the jury's consideration.[3] *State* v. *Fernando V.*, supra, 170 Conn. App. 46. In the Appellate Court, the state argued that the trial court properly excluded P's testimony "because it was both collateral in nature and entirely consistent with the testimony given by B and her mother." Id., 48–49. The state also contended that, even if it was error to exclude the evidence, the error was harmless because P's testimony "did not differ materially" from the testimony of B or her mother and therefore the exclusion "had little effect on the jury . . . ." (Internal quotation marks omitted.) Id., 69. The Appellate Court rejected those claims, holding that P's testimony improperly was excluded because it was relevant to "the issue of whether B had exhibited behaviors associated with some sexual assault victims, which had a clear and direct bearing on the central issue before the jury, namely, whether B had been sexually assaulted by the defendant." Id., 67. The Appellate Court further concluded that the improper exclusion of P's testimony was not harmless because the absence of any physical evidence or witnesses to the sexual assaults meant that "[t]he case turned largely on whether the jury believed B"; id., 69; and P's testimony, which "helped to paint B as having been an ordinary high school girl," necessarily would have "decrease[d] the likelihood in the eyes of the jury that an assault had occurred." Id., 68. The Appellate Court consequently reversed the judgment of conviction and remanded for a new trial. Id., 69. This certified appeal followed.

## II

The state first argues that the Appellate Court improperly found that the trial court had abused its discretion by excluding P's testimony. The state does not rely on the grounds it raised in the trial court or the Appellate Court but instead contends, for the first time, that P's testimony regarding B's behavior properly was excluded by the trial court because it was cumulative of other evidence in the record indicating that B "was basically 'an ordinary high school girl' . . . dating, getting good grades, participating in extracurricular activities and holding down a job." (Citation omitted.) This is a new argument. The state never argued in the trial court that P's testimony about B's behavior should be excluded because it was cumulative, nor did the trial court base its ruling on that ground. The argument also was not raised or briefed by the state as an alternative ground for affirmance in the Appellate Court, and the Appellate Court, like the trial court, did not address the argument as part of its admissibility analysis. On this record, we conclude that the state has failed to preserve its belated legal theory of the inadmissibility of P's behavioral testimony based on cumulativeness, made for the first time in this court, and we decline to review the claim. Because the state has abandoned all claims other than its contention that P's testimony was cumula-

tive; see, e.g., *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 255 n.3, 184 A.3d 741 (2018) (deeming arguments not raised and briefed in this court to be abandoned); the decision of the Appellate Court that the exclusion of P's testimony was improper effectively stands unchallenged and must be upheld.

"This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 539, 864 A.2d 847 (2005); see also *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 499, 43 A.3d 69 (2012) (rule that claim must be "raised and decided in the trial court . . . applies equally to alternate grounds for affirmance" [internal quotation marks omitted]). We have emphasized that "[t]hese requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) Id., 540; see also *State* v. *Miranda*, 327 Conn. 451, 465, 174 A.3d 770 (2018) ("[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." [Internal quotation marks omitted.]).

This reasoning applies with full force in the present case, in which the state's newly minted ground for exclusion, based on the supposedly cumulative nature of the excluded evidence, calls for a discretionary determination to be made by the trial court in the first instance. See, e.g., *Motzer* v. *Haberli*, 300 Conn. 733, 742, 15 A.3d 1084 (2011) ("We conclude that the trial court did not abuse its discretion in excluding the proffered evidence [as cumulative]. Our rules of evidence vest trial courts with discretion to exclude relevant evidence when 'its probative value is outweighed . . . by considerations of undue delay, waste of time or needless presentation of cumulative evidence.' "), quoting Conn. Code Evid. § 4-3. This particular exercise of discretion was not undertaken by the trial court in this case because the state never requested a ruling on the ground now being advanced. We cannot determine whether the trial court abused an exercise of discretion that it neither made nor was asked to make. Under

these circumstances, we decline to review the state's unpreserved claim.[4]

Our rules of reviewability in the evidentiary context are prudential in nature, not jurisdictional, but they serve essential purposes and promote vital principles, and only in the most compelling situation will we depart from them. Legal claims, arguments and objections regarding evidentiary matters ordinarily must be made at the right time and place, because that time and place is when the opposing party has the opportunity to respond to the point or to cure the defect, and it also is when the trial judge will be required to adjudicate the disputed issue within the particularized context defined by the circumstances then existing. Adhering to the requirement of specificity and contemporaneity promotes fairness between the parties and helps to ensure that trial and appellate judges remain optimally positioned to perform their respective roles. There are, of course, exceptional circumstances when this court will "consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court."[5] *Perez-Dickson* v. *Bridgeport*, supra, 304 Conn. 499. Nothing about the present case qualifies the state's unpreserved evidentiary claim for such exceptional treatment.

The Appellate Court determined that P's testimony improperly was excluded because it was relevant and "probative of the central issue of this case"—B's credibility. *State* v. *Fernando V.*, supra, 170 Conn. App. 64. In this court, the state does not challenge the Appellate Court's evidentiary holding on any basis other than the unpreserved claim of cumulativeness. Accordingly, the determination of the Appellate Court that P's testimony improperly was excluded must stand.

### III

We now must decide whether the improper exclusion of P's testimony was harmless. The state makes two arguments: first, that the excluded evidence was cumulative, and, second, that the case against the defendant was very strong and any inconsistencies in B's testimony were explored on cross-examination and considered by the jury. We disagree with both contentions. We view the record as the Appellate Court did and concur in its conclusion that the exclusion of P's testimony cannot be considered harmless on this record.

The law governing harmless error for nonconstitutional evidentiary claims is well settled. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence

or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808–809, 51 A.3d 1002 (2012); accord *State* v. *Jordan*, 329 Conn. 272, 287–88, 186 A.3d 1 (2018); *State* v. *Shaw*, 312 Conn. 85, 102, 90 A.3d 936 (2014). We have observed that cases that present the jury with a "credibility contest characterized by equivocal evidence . . . [are] far more prone to harmful error." (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 816–17.

The state seriously underestimates the potential impact of the excluded testimony. As the Appellate Court aptly pointed out, "the state's case here was not an exceedingly strong one" in light of the absence of "corroborating physical evidence or any witnesses to the alleged sexual assaults."[6] *State* v. *Fernando V.*, supra, 170 Conn. App. 68–69; see also *State* v. *Favoccia*, supra, 306 Conn. 809 (describing child sexual assault cases that lack physical evidence and turn "entirely on the credibility of the complainant" as "not particularly strong" [internal quotation marks omitted]); *State* v. *Grenier*, 257 Conn. 797, 808, 778 A.2d 159 (2001) (noting that "the state's case was not particularly strong" because child victim's "version of the events provided the only evidence of the defendant's guilt"); *State* v. *Alexander*, 254 Conn. 290, 308, 755 A.2d 868 (2000) (noting that "the state's case was not particularly strong in that it rested on the credibility of the [child] victim" [internal quotation marks omitted]). B's testimony was the only evidence of the defendant's guilt, and, therefore, this "case turned largely on whether the jury believed B." *State* v. *Fernando V.*, supra, 170 Conn. App. 69. Indeed, as the state explained to the jury in closing argument, "[w]hat this case really comes down to is one simple question, who do you believe?" By excluding P's testimony, the trial court deprived the defense of evidence that it could have used to cast doubt on the credibility of B's allegations. See *State* v. *Ritrovato*, 280 Conn. 36, 57–58, 905 A.2d 1079 (2006) (holding that improper exclusion of evidence pertinent to minor victim's credibility "would have cast sufficient doubt on [her] credibility [so as] to have influenced the jury's verdict on the sexual assault charges").

To understand more particularly the nature of the potential harm caused by the exclusion of P's testimony,

it is important to examine how that testimony became relevant to the state's case at trial. Evidently concerned that a lay jury might draw unwarranted adverse inferences about B's credibility from the fact that B had delayed telling her mother about being sexually assaulted, the state chose to present expert testimony at trial from Rosenberg explaining that delayed reporting is common in child sexual abuse cases and describing the psychological and emotional factors that make such a delay understandable. See *State* v. *Favoccia*, supra, 306 Conn. 817 (*Palmer*, *J.*, dissenting) (explaining that state may use expert testimony in child sexual abuse cases to explain victim behavior that is common but may not be known to laypersons). But Rosenberg's testimony did not stop at explaining delayed disclosure. The state also questioned Rosenberg at length about postdisclosure behavioral characteristics ("symptoms of trauma") commonly observed in teenagers and young adults who have been sexually assaulted. Rosenberg initially responded in general terms, stating that "being sexually abused tends to most—most typically, but not always, reduce the level of functioning of the person who has been victimized." The state asked for greater detail: "What are some symptoms of trauma from child sexual assault, that you've seen, in your practice, with victims who have made a disclosure?" Rosenberg answered by providing examples, including "disassociation, the kind of psychic numbing that can go on. . . . But in addition to that, typically, symptoms would be bad dreams, flashbacks of the events that had occurred . . . changes in functioning with regard to sleep, with regard to cognitive functioning, with regard to school functioning. [Withdrawal] is common. Depression is common. Heightened anxiety, particularly in the face of anything that is reminiscent of the event. . . . And those are some of the findings, typically." During cross-examination, Rosenberg highlighted depression as a particularly common symptom and explained that depression can manifest itself in a variety of ways, including, for example, "changes in mood and irritability and angry outbursts," as well as becoming "more withdrawn." As he concluded his answer about the most common behavioral symptoms, Rosenberg made it clear that his description was not exhaustive, stating that "[t]he list goes on."

Rosenberg's testimony became the lens through which the jury reasonably could have viewed the most critical issues in the case. The state presumably elicited his testimony about "behavioral symptoms" because it wanted to lend significance to B's mother's testimony that B had become more withdrawn than usual in the year prior to the defendant's arrest. In fact, the state argued this very inference in its closing argument to the jury when it suggested that B's withdrawal was a sign that she had been sexually abused.[7] Rosenberg's testimony was double-edged, however, because it pro-

vided the defense with an evidentiary basis to develop a jury argument that B's allegations of abuse should *not* be believed. The defense sought to raise the specter of reasonable doubt by arguing that B had not exhibited *any* of the many behavioral symptoms of trauma that the state's own expert said were typical and common among sexual abuse victims. Rosenberg's testimony, in other words, provided the defense with an opening to argue that the absence of such symptoms equates to an absence of abuse. The potential significance of P's testimony must be seen in this light.

With this framework in place, it becomes evident why the improper exclusion of P's testimony was not harmless. First, and most significantly, P's testimony was not cumulative because it would have presented the jury with *new* material, not heard from any other witness, regarding certain indicia of sexual abuse identified by Rosenberg. See *State* v. *Favoccia*, supra, 306 Conn. 808–809 (holding that cumulativeness is factor to be considered in harmless error analysis). No other witness had been asked whether B suffered from depression, anger or outbursts of violence, or if she had trouble focusing on issues or tasks at hand. These particular symptoms were among those identified by Rosenberg as common behavioral manifestations of trauma caused by sexual abuse. The evidentiary ruling under review excluded P's testimony that he did not observe B showing any of these specific symptoms of abuse during the past four years—evidence provided by no other witness. This testimony, if allowed, would have supplied defense counsel with additional grounds to argue that the abuse had never happened. New evidence is not cumulative evidence.

Second, the jury reasonably could have found that one significant aspect of the new information contained in P's testimony actually *conflicted* with the testimony of B's mother and thus could not have been *duplicative* of that testimony. B's mother testified that B had become more withdrawn prior to the defendant's arrest, which was made highly relevant by Rosenberg's subsequent testimony that "[d]epression can manifest itself in a variety of ways," including a victim's becoming "more withdrawn." A juror reasonably could have understood P's testimony that B did not exhibit any signs of depression as being inconsistent with the testimony of B's mother regarding B's withdrawal. See *United States* v. *Stewart*, 907 F.3d 677, 688 (2d Cir. 2018) ("[T]he fact of the inconsistency gives the jury an insight into the [witness'] state of mind; the inconsistency shows that the witness is either uncertain or untruthful. In either event, the inconsistency calls into question the [witness'] believability." [Internal quotation marks omitted.]), quoting 1 K. Broun, McCormick on Evidence (7th Ed. 2013) § 34, p. 209. The trial court's ruling prevented the defense from using P's testimony to challenge the mother's testimony that B had become

withdrawn, which, not insignificantly, was the *only* behavioral symptom of trauma allegedly exhibited by B. The Appellate Court summarized the unfairness: "The state cannot have it both ways: on the one hand, introducing its own evidence of B's behavior favorable to the state's case and, on the other, seeking to prevent the defendant from presenting his own contrary evidence. B's mother provided otherwise unrebutted testimony that B was more withdrawn than usual and stayed locked up in her room. The state then elicited testimony from Rosenberg that withdrawal was common among sexual assault victims, thereby giving damning context to the mother's observation. The defendant was entitled to produce his own witness in an effort to counter the state's evidence and demonstrate that B had not exhibited any behavioral characteristics that could be associated with sexual assault victims. That witness was P." *State* v. *Fernando V.*, supra, 170 Conn. App. 64–65. We believe that a reasonable juror may have been swayed by P's testimony when assessing whether to believe the allegations of abuse.

Further compounding the harm arising from the improper exclusion of P's testimony is the fact that the state affirmatively used B's mother's testimony about B's "withdrawal" and Rosenberg's testimony about behavioral symptoms of trauma in its arguments to the jury. In its closing argument, the state attempted to focus the jury's attention on one aspect of B's behavior to support B's allegation that she had been sexually assaulted by reminding the jury that B's mother had "testified that even she noticed [B] was acting more withdrawn, spending more time alone in her room." In rebuttal closing argument, the state again pointed out that "there was testimony that showed that [B] became more withdrawn before the arrest, that she spent more time to herself. [B] herself testified that after the arrest, she felt relief, that she could go home and not worry. . . . Rosenberg testified that symptoms from a traumatic experience, such as child sexual assault, can sometimes occur many years later." In our view, "[s]uch heavy reliance [on the withdrawal-related testimony] . . . expose[s] its central role in persuading the jury to convict, as the government clearly understood that [the] statement was a powerful weapon in its arsenal." (Internal quotation marks omitted.) *United States* v. *Stewart*, supra, 907 F.3d 689.

After seeking to persuade the jury to infer guilt based on the mother's testimony about one of the behavioral symptoms identified by Rosenberg, the state cannot fairly argue that it was harmless to exclude P's conflicting testimony that he saw no significant behavioral changes or depression in B. To the contrary, the exclusion of P's testimony deprived the defense of the ability, in its own summation to the jury, to undercut the state's argument by reminding the jury that P, who was among B's closest friends for the four years leading up to trial,

had observed *none* of the many symptoms of sexual abuse that Rosenberg had identified. Cf. *State* v. *Sawyer*, 279 Conn. 331, 360–61, 904 A.2d 101 (2006) (finding harm, in relevant part, because state repeatedly emphasized improperly admitted evidence in its closing argument), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 454–55 n.23, 953 A.2d 45 (2008); *State* v. *Alexander*, supra, 254 Conn. 308 (holding that prosecutor's improper remarks in closing argument were not harmless because they "directly addressed the critical issue in this case, the credibility of the victim and the defendant" [internal quotation marks omitted]).

Lastly, the state argues, and the dissent agrees, that the defendant's ability to cross-examine B and her mother renders the error harmless. This argument ignores two important points. First, Rosenberg testified *after* B and her mother, and, therefore, the behavioral template provided by him was not available to the defense during the cross-examination of those key witnesses. More broadly, and perhaps more importantly, a criminal defendant is not constrained to present his defense through witnesses selected by the state. "If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial"; (internal quotation marks omitted) *State* v. *Andrews*, 313 Conn. 266, 294, 96 A.3d 1199 (2014); which includes, among other things, an opportunity "to present [his] version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). This does not mean that there are no limits on the defendant's right to present his defense as he wishes; see *State* v. *Wright*, 320 Conn. 781, 818–19, 135 A.3d 1 (2016); but, because P's testimony was admissible and could have made a substantial impact on the jury, the improper exclusion of this testimony cannot be deemed harmless. "[T]he truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court . . . ." (Internal quotation marks omitted.) *Washington* v. *Texas*, supra, 22. Just as "the prosecution is entitled to prove its case by evidence of its own choice," so, too, does the defendant deserve the same opportunity to defend himself.[8] *Old Chief* v. *United States*, 519 U.S. 172, 186, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

It cannot be harmless error to "remove from the fact finder the very tools by which to make a credibility determination . . . ." *State* v. *Little*, 138 Conn. App. 106, 123, 50 A.3d 360, cert. denied, 307 Conn. 935, 56 A.3d 713 (2012); see also *Devincentz* v. *State*, 460 Md. 518, 562, 191 A.3d 373 (2018) (finding that complete exclusion of witness' testimony was not harmless error when "[t]he outcome of [the] case turned entirely on the relative credibility of the defendant and the accuser,"

because the exclusion "limited the jury's ability to assess [the accuser's] credibility . . . ." "[W]here credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error." *Devincentz* v. *State*, supra, 561. Because P's testimony was necessary for the jury to assess B's credibility, we conclude that the exclusion of his testimony was not harmless.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER and D'AURIA, Js., concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

** This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, D'Auria, Kahn and Ecker. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] Although §§ 53-21 (a) and 53a-71 (a) have been the subject of amendments since 2006; see, e.g., Public Acts 2007, No. 07-143, §§ 1 and 4 (amending §§ 53a-71 [a] and 53-21 [a], respectively); the year in which the conduct that formed the basis of the charges in the present case began, those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of §§ 53-21 (a) (2) and 53a-71 (a) (1) and (4).

[2] Rosenberg testified that these various symptoms "don't necessarily appear in everyone and that . . . even when they do appear, [they appear] in different kinds of ways." He also said that it was "more common than not" that an abuse victim between the ages of twelve and eighteen would exhibit "some sort of behavioral difficulties," and he identified depression as among the more common of the "behavioral characteristics" observed in those victims.

[3] The defendant also raised an additional evidentiary claim in the Appellate Court relating to the trial court's exclusion of a different portion of P's testimony, which the defense had offered at trial for the purpose of impeaching B and her mother's earlier testimony that the "defendant had tried to prevent the complainant from associating with boys of her own age." *State* v. *Fernando V.*, supra, 170 Conn. App. 46. This particular claim was not relied on by the Appellate Court as a basis for reversing the judgment of conviction and is not within the scope of the question certified for review by this court, which is limited to whether the Appellate Court improperly determined "that the trial court [had] abused its discretion in excluding the testimony of the victim's boyfriend on the issue of whether she had exhibited behaviors associated with some sexual assault victims" and whether the improper exclusion of P's testimony was harmful. *State* v. *Fernando V.*, 324 Conn. 923, 155 A.3d 753 (2017). Although the defendant raised the issue regarding his treatment of B's male acquaintances, among other issues, as an alternative ground on which to affirm the judgment of the Appellate Court, we decline to address it in light of our disposition of the certified question.

[4] The dissent suggests that this conclusion is in "apparent conflict" with a line of cases holding that this court may rely on any grounds supported by the record to affirm the judgment of a trial court, including alternative evidentiary grounds raised for the first time on appeal. We perceive no such conflict, however, for precisely the reason identified by the dissent when it observes that one of the keys to resolving this issue is "whether the alternative ground is one [on which] the trial court *would have been forced to rule in favor of the* [*party prevailing at trial*]." (Emphasis added; internal quotation marks omitted.) Footnote 2 of the dissenting opinion, quoting *State* v. *Cameron M.*, 307 Conn. 504, 526–27, 55 A.3d 272 (2012) (overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 748 n.14, 91 A.3d 862 [2014]), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013). When a trial court that has excluded (or admitted) evidence for the wrong reason nonetheless would have been *required* to make the same evidentiary ruling on the unpreserved alternative ground *as a matter of*

*law*, there is no reason that a reviewing court should be prevented from substituting the legally compelled ground for the legally flawed ground. The present case is altogether different, however, because it involves an unpreserved alternative ground (cumulativeness) that ordinarily is *discretionary* in nature; the state has not, and could not, argue that the trial court here "would have been forced to rule" in its favor on this ground. See part III of this opinion.

[5] The state, as the appellant here, was not required to file notice in this court that it intended to raise an alternative ground for affirmance pursuant to Practice Book § 84-11, because that provision applies only to an appellee who wishes to raise an alternative ground to affirm the judgment of the Appellate Court in a certified appeal. See *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 568 n.11, 916 A.2d 5 (2007). Rather, the state's procedural default arises from its failure *at trial* to preserve the legal issue for appellate review. As *Vine* instructs, in cases in which Practice Book § 84-11 is inapplicable, "because the [appellant is] raising an [alternative] ground to affirm the judgment of the trial court, the principles governing preservation of claims raising [alternative] grounds for affirmance apply . . . ." Id.

[6] The state contends that there was not a complete absence of corroborating evidence of the alleged sexual assaults, because B's brother "testified that he saw B in the defendant's bedroom, putting on her belt." We disagree with the state's characterization of the strength of the brother's testimony for two reasons. First, B's brother did not witness any inappropriate interactions at any time. Second, the brother's testimony was confused, contradictory and difficult to follow. The record reflects that the state continually had to refresh the brother's recollection with a sworn statement given prior to trial, which was eventually admitted into evidence under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), after the brother testified that he could not remember whether he had seen the defendant and B together on a second occasion. We cannot agree with the state that the brother's testimony materially strengthened the state's case against the defendant.

We also disagree with the dissent's suggestion that we are "attempt[ing] to rationalize an innocent explanation for [the defendant's] sneaky behavior . . . [with] his teenage stepdaughter . . . ." See footnote 7 of the dissenting opinion. We are not "rationalizing" anything; we are assessing the strength of the state's case on the basis of the evidence properly adduced at trial. We fail to see how the testimony of B's brother "significantly strengthened the state's case . . . ."

[7] The dissent's assertion that the excluded evidence "did not pertain directly to the veracity of the complainant or the allegations themselves" fails to acknowledge the direct bearing of this evidence on the assessment of B's credibility under the particular circumstances of this case. A reasonable juror, unsure of whether to believe the allegations, could have used the behavioral symptoms identified by Rosenberg as a guide to decide whether the allegations of abuse were credible. This presumably is the very reason that the state elicited that expert testimony in the first place. It is unfair now, in assessing the potential significance of the evidence offered by the defense for the very purpose of taking advantage of the state's inferential model, to say that the logic was weak and inconsequential.

[8] This same point demonstrates the flaw in the dissent's suggestion that the defendant suffered no disadvantage because defense counsel was able to present a jury argument based on the testimony of B and her mother even without the testimony of P. It is inaccurate to posit that no harm ensued from the trial court's evidentiary ruling just because defense counsel tried his best using the scraps of state-supplied evidence available to him. The trial court's erroneous evidentiary ruling was harmful because the defense's jury argument would have been materially and significantly stronger had he been able to make use of P's excluded testimony.